## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

**CACI, INC. – FEDERAL,**
**1100 North Glebe Road**
**Arlington, VA 22201**

                            Plaintiff,

       v.

**BAO-TRAN X. NGO,**
      **Aka CJ Ngo,**
**42516 Legacy Park Dr,**
**Ashburn, Va. 20148**

                     Defendant**.**

Case No.   1:17-cv-00988

## <u>VERIFIED COMPLAINT</u>

     1.     Plaintiff CACI, INC. – FEDERAL ("CACI" or "Plaintiff"), by its attorneys, for its Complaint against Bao-Tran ("CJ") X. Ngo ("Ngo" or "Defendant"),  states as follows:

### <u>NATURE OF THE ACTION</u>

     2.     This action is brought by CACI to prevent its former employee, Ngo, from further misappropriating its trade secrets and other confidential and proprietary information in violation of: (a) the federal Defend Trade Secrets Act; (b) the Virginia Uniform Trade Secrets Act; (b) the confidentiality, non-solicitation and non-competition provisions of Ngo's employment agreements; and (d) the fiduciary duties Ngo owed to CACI both before and after the termination of her employment.  Prior to her August 11, 2017, termination, Ngo surreptitiously forwarded several hundred CACI emails to her personal email accounts, many containing CACI competitive and trade secret information including information specifically related to a large, upcoming government project coming for which she was integrally involved in CACI's competitive capture process, and

many containing attachments clearly labeled "CACI Proprietary" and/or "CACI Competitive Sensitive." These emails and attachments are related to a number of ongoing CACI projects and contracts in support of national security missions and government transformation for Intelligence, Defense, and Federal Civilian customers, and much of the information misappropriated by Ngo relates to the project being competed. All of these materials could be used by a competitor to gain a competitive advantage and unfairly compete against CACI in the bidding for that and other government contracts.

3.      Through this action, CACI seeks emergency injunctive relief directing Ngo to return CACI's trade secret and other confidential and/or proprietary information, as well as preliminary and permanent injunctive relief preventing further acts of misappropriation and ongoing breaches of the confidentiality, non-solicitation and non-compete provisions of Ngo's employment agreements.

## PARTIES

4.      CACI is a Delaware corporation with its principal place of business at 1100 North Glebe Road, in Arlington Virginia.

5.      Ngo is a natural person who, upon information and belief, resides and may be served with process at her home address of 42516 Legacy Park Drive, in Ashburn Virginia.

6.      Ngo most recently worked for CACI as its Division Vice President, Secure Tactical Communications, in Virginia until her termination in mid-August 2017.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because CACI asserts claims for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* against Ngo. This Court has supplemental or pendant jurisdiction over CACI's

remaining claims, pursuant to 28 U.S.C. § 1367, because such claims are so related to CACI's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Venue is appropriate in this judicial district under 28 U.S.C. §1391(b)(1) because Ngo is a resident of Virginia and resides in this district. Venue also is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because the events that gave rise to this Complaint occurred in this district.

## FACTS RELEVANT TO ALL CLAIMS

### Ngo's Employment with CACI

9.     Ngo worked for CACI from October 17, 2014 until her termination on August 11, 2017.  CACI hired Ngo for the position of Director. CACI last employed Ngo as its Division Vice President, Secure Tactical Communications.  In addition to her role in management of the Secure Tactical Communications division, Ms. Ngo simultaneously served as the Program Manager on a CACI program for an intelligence agency customer.

10.     During her employment at CACI, Ngo's duties included

    A.     Developing project scopes of services;

    B.     Negotiating fees;

    C.     Reviewing submittals and payment requests;

    D.     Supervising, tracking, and coordinating project tasks;

    E.     Monitoring project statuses;

    F.     Managing employees;

    G.     Maintaining project confidentiality;

    H.     Preparing project reports and memoranda;

I. Developing client contacts;

J. Liaising with client contacts;

K. Identifying new project opportunities and client needs; and

L. Performing related work as required.

11. As a CACI employee, Ngo was granted access to CACI's confidential, proprietary, and trade secret information, including, for example, its pricing information, rate sheets, quotes, bid and proposal costs, applicant and employee resumes, competitive intelligence, and contracts.

12. By virtue of her position, Ngo also was granted extensive direct contact with CACI's customers and the key decision-makers at those customers.

13. The misappropriated information is not generally known to others in the government contractor industry. Thus, it is highly valuable, particularly during the competitive bid process and recompete process. CACI expended significant effort and expenses in compiling the confidential, proprietary and trade secret information to which it provided Ngo access.

14. Ngo learned of and benefitted from CACI's confidential, proprietary, and trade secret information as a result of her employment with CACI.

15. CACI provided Ngo with a laptop computer, smartphone, and access to CACI's external and internal network and database to use in connection with her employment for CACI. CACI likewise provided Ngo with a company email address.

**CACI's Business and Efforts to Protect its Business Information**

16. CACI provides information solutions and services in support of national security missions and government transformation for Intelligence, Defense, and Federal Civilian customers.

17.     CACI's government contracting business depends upon confidentiality. Of its approximately 18,600 worldwide employees, roughly sixty percent hold security clearances.

18.     CACI operates in a highly competitive, interstate market. CACI's success in the industry depends on its ability to maintain the secrecy of its contracts, bid processes and strategies, bid information, pricing information, profit and loss calculations, quotes, customer contact lists, hiring and staffing strategies, and other confidential, proprietary and trade secret information.

19.     CACI's major competitors in the government contracting market include Raytheon and General Dynamics.  These and other competitors offer their own government contracting services and compete with CACI for a share of the same market and the same customers.

20.     In addition to the major competitors described above, a number of smaller enterprises compete with CACI in the government contracting market, and new competitors in this market are constantly being formed by individuals leaving government service and/or established government contracting firms.

21.     CACI's confidential bid processes (which outline specific steps needed to take to capture contracts), its pricing information (which contains detailed rates and profit and loss calculations), its bid and proposal costs, and its confidential customer lists (which contain detailed customer contact information and information regarding key decision-makers) are particularly valuable. The information contained in these documents is not available to the public and not generally known in the government contractor industry. CACI expended significant effort and expenses in developing and compiling the information contained in these and related documents and in maintaining their confidentiality and secrecy.  CACI did so to enable it to successfully bid for new customers and successfully compete for existing customer contracts.

22.     The value of CACI's confidential, proprietary and trade secret information is in its exclusive use by CACI and its employees.  This information is one of CACI's most valuable assets.

23.     CACI would lose its competitive advantage if one of its competitors obtained its confidential, proprietary, and trade secret information.

24.     For example, a competitor could use CACI's:

A.     pricing, rate, and bid information, which is based on CACI's experience and bidding assumptions, to underbid CACI;

B.     staff directories and hiring and staffing strategies to fill-out its talent pool and hire CACI employees or potential CACI employees;

C.     meeting notes and client relationships to understand client desires and shape bids in contrast to CACI's proposals; and/or

D.     bid processes and strategies, which are based on CACI's experience and relationships with customers, to develop competing strategies to undermine CACI's efforts.

25.     CACI takes steps to protect its confidential, proprietary, and trade secret information, including requiring employees with access to sign an Employment Agreement with a confidentiality provision.

26.     To protect the secrecy and value of its confidential, proprietary, and trade secret information, CACI required Ngo to execute an Employment Agreement with a confidentiality provision, a copy of which is attached to the Declaration of John Mengucci as Exhibit A, which is attached to the Memorandum in support of CACI's Motion, and incorporated here by reference. The "Confidential Information" provision of Ngo's Employment Agreement provides:

**Confidential Information.** Except as specifically authorized, I will not:

(a) Disclose, publish or use, or knowingly permit anyone else to disclose, publish or use, any proprietary or confidential information or trade Secrets (collectively, "Confidential Information") of CACI, or of CACI's clients, business partners, or subcontractors, at any time during or after my employment with CACI. Confidential Information includes, without limitation, business proposals; costs, margins and/or profit methodologies; planned new products and services; customer lists; and proprietary methodologies. This obligation will continue so long as such information remains legally protectable from unauthorized disclosure or use. I will also return to CACI all Confidential Information that I possess at the end of my employment.

(b) In addition, during my employment with CACI, I will not:

i.      disclose or use any Confidential Information of others (including my former employers, clients, or business partners), or facilitate such disclosure or use by anyone else;

ii.     be a party to a situation in which Confidential Information of others has been improperly obtained;

iii.    receive Confidential Information of others except pursuant to a written confidentiality agreement signed by an authorized company signatory; or

iv.     obtain information about the marketplace and competitive surroundings in a manner inconsistent with ethical commercial practices.

(c) In addition, I understand that after my employment with CACI I may not accept any position of employment with any new employer if the nature of the position is such that the new employment will inevitably require me to disclose or use Confidential Information in order to fulfill my obligations to the new employer.

(d) I will promptly report to the Corporate Legal Division any: (i) offer of Confidential Information which I have reason to believe may have been obtained improperly, and (ii) attempts made by another CACI employee to improperly gain knowledge of any Confidential Information of others.

27.     Accordingly, in executing her Employment Agreement, Ngo was entrusted to safeguard CACI Confidential Information and acknowledged and agreed to maintain the confidentiality of the "proprietary or confidential information or Trade Secrets" that CACI provided to her during her employment, not to disseminate or use that information for her benefit or that of a competitor, and to return it to CACI at the end of her employment.

28.     CACI takes other reasonable and necessary precautions to protect its confidential information and trade secrets from improper disclosure. For example,

A.     CACI marks such information "CACI Proprietary Information" or "CACI Proprietary Information – Competitive Sensitive;"

B.     CACI's computer systems and internal databases are password-protected;

C.     CACI employees with approved mobile devices have encrypted email accounts;

D.     CACI instructs employees of their fiduciary duties to use trade secrets or confidential or proprietary information in authorized manners only.  CACI permits the disclosure of its trade secretes or confidential information to those outside CACI in conjunction with a disclosure agreement provided by the Contracts or Legal Division only.  Among other topics, CACI outlines these policies, procedures, and expectations in its Standards of Ethics and Business Conduct Manual, Compliance Policies, and User Agreements, which are disseminated and available to CACI employees.  *See* Mengucci Decl., Ex. B.

E.     CACI employees must read CACI's Standard of Ethics and Business Conduct, Electronic Communications User Agreement, and Acceptable Use Agreement and certify their understanding of the same.  Ngo certified that she read, understood, and agreed to comply with these policies, among others.  *See* Mengucci Decl., Ex. C.

29.     Ngo's Employment Agreement also included a non-compete provision. Ngo signed the provision, acknowledging that it protects CACI's business relationships, that CACI may reasonably forbid Ngo from competing with CACI, that Ngo will not compete with CACI to provide goods or services to CACI clients for one year, that Ngo will not compete, for two years,

for the award of any contract or task that Ngo worked on during her final year of employment at CACI; and that competing against CACI in violation of the Employment Agreement could breach the Employment agreement and Ngo's fiduciary responsibilities to CACI.   The non-compete provision provides:

> **Non-compete Restrictions.** It is helpful to review this paragraph several times in order to fully appreciate its meaning and the limited nature of the restrictions.
>
> (a) I understand that this non-compete restriction is aimed at protecting CACI's relationship with its current and prospective clients, as such clients. are specifically named in written proposals, contracts and task orders (together, these are referred to as "CACI Clients"), I understand that the definition of CACI Clients as used in this Agreement is intended to cover the specific program offices or activities which CACI pursues or performs work for within large government departments, such as the Department of the Navy or the Army, not the greater department in general.
>
> (b) I agree that CACI may reasonably protect its relationships with CACI Clients (as defined above) by forbidding me from competing with CACI or work with: (i) any CACI Clients while I work at CACI, and (ii) certain CACI Clients for a reasonable period of time after the end of my CACI employment.
>
> (c) During my employment with CACI, I will not directly or indirectly sell, market or otherwise provide goods or services to any CACI Clients in competition with CACI.
>
> (d) For a period of one (1) year after the end of that employment (unless CACI terminates my employment without cause due to lack of work), I will not directly or indirectly provide goods or services to CACI Clients when such goods or services are in competition with those provided under contract or task order, or offered pursuant to an formal or informal proposal, to such clients by any CACI department for which I worked within one (1) year prior to the end of my CACI employment.
>
> e) During my employment with CACI and for a period of two (2) years after the end of that employment, I will not participate in competition for the award of any contract or task that any CACI department in which I worked within one (1) year prior to the end of my CACI employment had identified as an opportunity prior to the end of my CACI employment.
>
> (f) I understand that if I were to compete with CACI in violation of subparagraphs (c), (d) and (e) above, such competition could breach both this agreement and my fiduciary responsibilities as described in the "Fiduciary Duties" paragraph above. I further understand that competition prohibited by subparagraphs

(c), (d) and (e) above includes permitting another entity's use of my name or resume in any proposal or other application for such a contract or task order.

*See* Mengucci Decl., Ex. A.

30.   Ngo's Employment Agreement also included a recitation of her fiduciary responsibilities duties, and her agreement to perform them during and after her employment with CACI.  The relevant provision provides:

**Fiduciary Duties.** I understand that as an employee the law places upon me certain fiduciary responsibilities to CACI including, the duty to place he interests of CACI and its shareholders above my own personal interest in any case where they might conflict. I will fully perform my fiduciary responsibilities to CACI as required by law both during and after the period of my employment.

*See* Mengucci Decl., Ex. A.

### Ngo Misappropriates CACI's Confidential Information

31.   Ngo was deeply involved in a number of ongoing CACI projects and contracts for its government clients.  Two of these projects, referred to by CACI and the Government customer by code-names due to their sensitive nature, is due for a competition in the first quarter of 2018 and CACI has been preparing for that competitive process for at least six months.  A Market Survey was issued in March 2017 which indicated that the process for this project formally begins in the fourth quarter of 2017 when the client will issue a draft request for proposals ("RFP") before finalizing the RFP and seeking bids for submission in the first quarter of 2018.  As part of those preparations, CACI formulated a "capture plan" for the project reflecting its strategies (which, in turn, are based in whole or on part on its trade secrets and other proprietary information).

32.   The project is an important part of CACI's government contracting portfolio.  It is a significant contract that consolidates requirements of four existing contracts, two of which are performed by CACI competitors.  CACI performed the other two contracts, and, according to the newly consolidated project profile, CACI is the incumbent for about 40% of the upcoming

consolidated project work.  This consolidation and competition is a high-profile project within the industry, with an estimated ceiling value of $450,000,000.  CACI's revenue in FY 2017 was $4.35 billion, so this project would represent a significant portion of CACI's business in FY 2018 and beyond.

33.     As the draft RFP is being prepared, CACI is working to position itself to best compete for the competitive procurement.  Without this capture plan, which includes proprietary feedback from, and observations relating to, the government client at issue, CACI's chances of a successful bid drop significantly.

34.     Executing this capture plan and positioning CACI to successfully bid takes significant resources and time.  CACI must identify appropriate employees, sub-contractors, experts, and more to ensure that it submits a competitive bid and expend hundreds of thousands of dollars in costs for the competition.  CACI's competitors are likely performing similar preparatory work.

35.     Because of the project's consolidation of other contracts, size, and visibility within the industry, the bidding process will be competitive and rigorous.  CACI's capture information— the proprietary techniques and strategies developed to ensure that it submits the best and most competitive bid proposal possible and delivers the best results for its clients—are documented and circulated on a need to know basis to individuals involved in proposal preparations and project delivery.

36.     Ngo was intimately involved in the procurement for the project, and had a substantive role in that effort and access to sensitive documents and other information related to that project and CACI's capture plan for the project.  Ngo also had access to proprietary and competitively sensitive trade secret information related to CACI's business.  This trade secret

information related not only to specific client contracts and prospective client proposals, but also to CACI's overall competitive strategies, finances (including costs and profit margins), recruiting efforts, and key customer contacts, and other information.

37.     Ngo also had access to CACI pricing information, rate sheets, quotes, bid and proposal costs, applicant and employee resumes, and contracts.  She also was granted extensive direct contact with CACI's customers and the key decision-makers at those customers.  This information is not generally known to others in the government-contracting industry and, thus, it is competitively sensitive and highly valuable.

38.     In early August 2017, CACI began a review of Ms. Ngo's management of several contracts over which she had responsibility.

39.     Ngo was placed on administrative leave on August 7, 2017.  The notice placing Ngo on administrative leave informed her that while on administrative leave, she was prohibited from entering or accessing any customer or CACI facility or site; that she was prohibited from communicating with any customer, CACI, consultant, subcontractor or competitor personnel regarding any programs or contracts relating to CACI or CACI's customers; and that these prohibitions included any communications relating to her employment or leave status at CACI or any aspect of the investigation.  The notice explicitly emphasized that these prohibitions on communications were "as broad, absolute and unqualified as possible."

40.     The investigation established that during the one-week period between being placed on administrative leave and her termination, Ngo forwarded hundreds of CACI emails to her personal accounts; many of these emails included PowerPoint, Excel, and Word attachments and were labelled "CACI Proprietary Information" or "CACI Proprietary Information – Competitive

Sensitive."[1]  The emails and their attachments contain trade secret, confidential or commercially-sensitive information.

41.     Ngo could access these emails and attachments via her CACI email address.  Indeed she did so in order to forward them to her personal accounts.  Thus she had no need to send the messages and attachments to her personal accounts.

42.     Ngo was terminated on August 11, 2017.

43.     After Ngo was terminated, and due to CACI's continued concerns that Ngo will join a direct competitor and use CACI's trade secret and other confidential information to unfairly compete against CACI, further investigation was conducted and revealed that Ngo had been forwarding CACI emails and proprietary and competitive information to her personal Gmail and Yahoo accounts (or to cc those personal accounts when responding to emails from her CACI email account) as early as April 2017.

44.     From April 1, 2017 until her termination on August 11, 2017, Ngo sent and received over 17,500 in her CACI email account.  In that same time period she selectively forwarded approximately 420 messages to her personal addresses.  The 420-forwarded messages represent 2.4% of all the messages Ngo sent and received during her CACI employment, indicating that Ngo selectively and purposefully chose these confidential, proprietary, and trade secret documents to transfer and misappropriate to her personal email accounts.

---

[1] They also contain government documents marked "FOUO", which means "For Official Use Only."  This is a government designation used by the Department of Defense to identify material that may be exempt from mandatory release to the public under the Freedom of Information Act. Pages with the "FOUO" designation have been removed from the Declaration exhibits and replaced with a general description of the content to maintain the integrity of that designation. Some of the documents Ngo misappropriated were marked "FOUO" in their entirety and are not included for that reason.

45.     The Mengucci Declaration lists and describes key examples of the emails and attachments Ngo misappropriated.  *See* Decl. of John Mengucci, Exs. D – CC.  Examples include:

A.     Exhibit D, which is a PowerPoint presentation entitled "[XYZ][2] Weekly Tag Up – 9 Aug 2017" that details CACI's plan to capture the XYZ contract.  The presentation is a comprehensive capture strategy for the competition.  Among other important things, it outlines upcoming meetings with client contacts; divides tasks among the competition proposal team members; describes initial agreements with sub-contractors and partners and delineates preferred collaboration opportunities; and notes key client contacts and discussions.

B.     Exhibit E, which is an Excel spreadsheet entitled "Spend Plan [XYZ] 04-21-17" that describes CACI's bid and proposal costs.  It lists bid preparation activities by CACI employee, including capture management, solutioning, technical proposals, authoring, reviewing, and producing.  It also lists each individual's hourly rate and forecasts hours and costs for each month from April 2017 (the beginning of the capture strategy) to October 2018.  The spreadsheet thus contains CACI's budget, hours, and costs associated with bidding for the XYZ contract.  This is highly sensitive information for the competition.  It was attached to an email entitled "Fwd: [XYZ] B&P," dated July 19, 2017.

C.     Exhibit F, which is a PowerPoint presentation entitled "[XYZ] Strategic Capture Review."  This June 23, 2017 presentation represents CACI's blueprint to win the XYZ competition.  It describes client constraints driving the competitive process, CACI's positioning within the market, an overview of the competitive opportunity, CACI's

---

[2] CACI has removed this project's code name and substituted it with "XYZ" in the briefing for confidentiality purposes.

incumbency vis-à-vis its competitors, and CACI's contract plans and the client's relevant organizational structure. It also describes CACI's key shaping efforts, the competitive landscape for the competition, including the strengths and weaknesses of CACI's competitors, CACI's teaming strategy, and its overall competitive strategy. In short, it contains CACI's capture strategy.

D.      Exhibit I, which is an email entitled "Fwd: Action Items - 27 July [XYZ] Meeting." It records action items for CACI team members. The email tasks CACI employees, including Ngo, with key tasks. For instance, Ngo was to meet with the client to understand its reorganization and maintain close ties with CACI's competitor. The email also addresses the XYZ B&P planning, subcontracting, and specific written work-product to be delivered to the client. These important taskings align with CACI's competition capture strategy.

E.      Exhibit K, which is a Word document. Among other sensitive information, it lists key project successes and challenges. The document also explains CACI's competitive advantages, value-adds to past projects, and goals for the upcoming RFP.

F.      Exhibit L, which is a PowerPoint presentation entitled "Project Management Review (PMR) – Professional Services – [ABC][3]." The presentation reviews CACI's work on one of the two contracts it serviced that will be a part of the consolidated competition. The presentation describes CACI's achievements, staffing, subcontracting labor, hiring processes, project costs, project risks, customer stakeholders and their satisfaction and relationship with CACI employees, CACI's past meetings with client representatives, and

---

[3] CACI has removed this project's code name and substituted it with "ABC" in the briefing for confidentiality purposes.

CACI's work towards maximizing its award fee.  It is a blueprint for measuring the project's success.

G.      Exhibit M, which is a PowerPoint presentation entitled "GIO Programs TODAY and TOMORROW."   It contains CACI's understanding of the client's consolidation of its four existing contracts into one project up for competition.  It also identifies those key employees responsible for overseeing the projects in the future.

H.      Exhibit Q, which is an Excel spreadsheet entitled "[XYZ] Actions."  It lists actions that CACI team members are to undertake.  It describes each action, the date it is due, the CACI employee assigned to complete each task, and offers notes about each task and its completion.  The spreadsheet lists the many tasks CACI determined were necessary to undertake and complete in order to execute on its capture strategy.

I.      Exhibits S and T, which are email messages.  They summarize client concerns.  They also outline CACI staffing issues.  A CACI competitor could leverage this information against CACI to undermine it in the bid process.

J.      Exhibit W, which is an email message entitled "Fw: Fy17 forecast rates."  It contains CACI cost data, forecasts, and rate information for CACI projects, including those being consolidated into the competition.  This information is tantamount to CACI pricing because contracting, especially service contracts, are based on rate information.

K.      Exhibit Y, which is an email entitled "Fwd: Q4 Recap" and its attached PowerPoint presentation.  The email itself states that it should not be distributed because it contains "lots of financial and proprietary information."  In fact it contains CACI revenue information, rate information, and 2018 pipeline information.   The competition is

highlighted for its B&P costs in 2018, and the importance of engaging with the client early to understand the upcoming RFP.

46.      Moreover, Ngo sent a flurry of emails with attachments in the middle of the night of August 8, 2017, shortly after having been placed on administrative leave.  Fifteen messages were forwarded from 3:27 am to 3:35 am.  She continued this practice, sending a few more messages that morning around 5:25 am, and again sending messages to herself around 4:11 am on August 10, 2017.

47.      This trade secret information, which CACI developed over a period of many years and at considerable expense, related not only to specific client contracts and prospective client proposals, but also to CACI's overall competitive strategies, finances (including revenue at the corporate, division and project level, costs, rates to include direct labor rates, indirect labor rates, wrap rates and profit margins), recruiting efforts (including strategies for hiring personnel with specifically required government clearances), and key customer contacts and other information (including internal capabilities for secure communications between employees performing work on sensitive government contracts).  The information represents CACI's highly proprietary data, long-formed institutional memory and outlines its strengths and strategies for proposals, procurements, and project-delivery.

48.      If this trade secret, confidential or commercially-sensitive information were to come into the possession of a competitor, then it could be used to unfairly compete against CACI.

49.      The emails and attachments also contain government documents marked "FOUO", which means "For Official Use Only."  This is a government designation used by the Department of Defense to identify material that may be exempt from mandatory release to the public under the

Freedom of Information Act. CACI has removed and generally described pages with the "FOUO" label in order to preserve government confidentiality.

50. There is no legitimate reason for Ngo to have forwarded the information described above and in the Mengucci Declaration to her personal email addresses. The project-specific information has only one use, and that is to help prepare the most competitive bids possible when those projects are up for competition. Moreover, information regarding CACI's competitive strategies, finances, margins and costs, and customer lists are useless to Ngo unless she intends to use that information for her own benefit or the benefit of a CACI competitor – at which point the information is incredibly valuable and provides an enormous competitive advantage by virtue of the fact that CACI has maintained its secrecy.

51. The information Ngo unlawfully accessed and misappropriated from CACI would be highly valuable to CACI's competitors because it would allow such a competitor to shape its bid around CACI's strategies, underbid CACI, and otherwise leverage CACI's well developed internal business processes to its own competitive use. And the project-specific information Ngo misappropriated has only one use—to help prepare the most competitive bids possible when those projects are up for competition.

52. Under these circumstances, the only reasonable conclusion is that Ngo intended to misappropriate CACI's confidential, proprietary, and trade secret information and to use this information to compete with CACI. On information and belief, Ngo is currently either: (a) seeking employment with one of CACI's established competitors, in a position similar to the one she held when she was terminated; and/or (b) attempting to establish her own competing business.

53. As a result of CACI's misappropriation of CACI's confidential, proprietary, and trade secret information, CACI has suffered and will continue to suffer irreparable harm.

54.     As a result of Ngo's misappropriation of CACI's confidential, proprietary, and trade secret information, CACI has suffered and will continue to suffer significant damages.

55.     CACI has no adequate remedy at law. If the Court does not enjoin Ngo's continued misappropriation and use of its confidential, proprietary, and trade secret information, then CACI will lose business, goodwill, customers and its competitive advantage in the market in which it does business.  This is particularly true in the government contracting industry where incumbent status is of unquantifiable value in obtaining future awards.

56.     Because of the critical nature of the information Ngo misappropriated, Ngo's actions have the potential to damage CACI's overall business operations permanently and irreparably.

57.     CACI is entitled to preliminary and permanent injunctive relief enjoining Ngo from, among other things, continuing to use and/or disclose CACI's confidential, proprietary and trade secret information.

### CAUSES OF ACTION

### Count I – Misappropriation of Trade Secrets
### Under the Defend Trade Secrets Act of 2016

58.     CACI realleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

59.     Ngo transferred, without authorization, CACI's trade secret information, including, but not limited to the documents identified above and other documents contained on Ngo's company computer, smartphone, and email server (the "Trade Secret Information").

60.     On information and belief, Ngo has used, continues to use and, unless enjoined, will continue to use CACI Trade Secret Information to compete with CACI.

61.     CACI compiled the Trade Secret Information over many years and at great expense.

62.     CACI kept this information confidential, and took reasonable steps to preserve its secrecy, including, but not limited to, requiring Ngo to execute an Employment Agreement with a confidentially provision and restricting access to the Trade Secret information through a variety of electronic and other means.

63.     The Trade Secret Information is secret.  It is not generally known or available to the public or CACI's competitors, and it is not readily ascertainable by other means.  CACI goes to great expense to maintain its confidentiality.

64.     The Trade Secret Information provides CACI with a competitive advantage in the government contractor marketplace.

65.     CACI's Trade Secret Information is a "trade secret" under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.* (the "DTSA").

66.     Ngo acquired knowledge of CACI's Trade Secret Information in her capacity as Director, Program Manager, and Division Vice President, and thus owed and continues to owe CACI a duty to maintain the secrecy of such information.

67.     Ngo accessed and transferred the Trade Secret Information in violation of her legal obligations to CACI.

68.     Ngo continues to possess CACI's Trade Secret Information.

69.     Ngo's actions violate the Defend Trade Secrets Act.

70.     Ngo's actions in transferring and misappropriating CACI's Trade Secret Information for her own gain were willful, wanton, and malicious, and were taken with reckless disregard for CACI's rights.

71.     Ngo's actions have caused and will continue to cause CACI irreparable harm if not preliminarily and permanently enjoined.

72.    CACI suffers irreparable harm from Ngo's action, including potential loss of business, reputation, goodwill and trade secrets, all of which cannot be compensated by money damages.

73.    CACI has no adequate remedy at law because Ngo's actions are affecting CACI's goodwill, reputation, and ability to compete in a highly competitive marketplace.

### Count II – Misappropriation of Trade Secrets
### Under the Virginia Uniform Trade Secrets Act

74.    CACI realleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

75.    As set forth above in great detail, Ngo transferred CACI's Trade Secret Information.

76.    CACI's Trade Secret Information is a "trade secret" under the Virginia Uniform Trade Secrets Act, Section 59.1-336, *et seq.*, of the Code of Virginia, as amended (the "Virginia Uniform Trade Secrets Act").

77.    Ngo acquired knowledge of CACI's Trade Secret Information in her capacity as a CACI Director, Program Manager, and later Division Vice President, and thus owed and continues to owe CACI a duty to maintain the secrecy of such information.

78.    Ngo accessed and transferred the Trade Secret Information in violation of her legal obligations to CACI.

79.    Ngo continues to possess CACI's Trade Secret Information.

80.    Ngo's actions violate the Virginia Uniform Trade Secrets Act.

81.    Ngo's actions in transferring and misappropriating CACI's Trade Secret Information for her own gain were willful, wanton, and malicious, and were taken with reckless disregard for CACI's rights.

82.     Ngo's actions have caused and will continue to cause CACI irreparable harm if not preliminarily and permanently enjoined.

83.     CACI suffers irreparable harm from Ngo's action, including potential loss of business, reputation, goodwill and trade secrets, all of which cannot be compensated by money damages.

84.     CACI has no adequate remedy at law because Ngo's actions are affecting CACI's goodwill, reputation, and ability to compete in a highly competitive marketplace.

### Count III – Breach of Contract

85.     CACI realleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

86.     The Employment Agreement constitutes a contract between CACI and Ngo.

87.     In consideration of her employment, Ngo agreed to be bound by the terms and conditions set forth in her Employment Agreement.

88.     As a condition of her employment, among other things, Ngo agreed that she would maintain the confidentiality of the "proprietary or confidential information or Trade Secrets" that CACI provided to her during her employment.

89.     As a condition of her employment, among other things, Ngo agreed to return all confidential information of CACI's that she possesses at the end of her employment.

90.     As a condition of her employment, among other things, Ngo agreed to protect CACI's business relationships; not to compete with CACI to provide goods or services to CACI clients for one year; not to compete, for two years, for the award of any contract or task that Ngo worked on during her final year of employment at CACI; and that competing against CACI in

violation of the Employment Agreement could breach the Employment agreement and Ngo's fiduciary responsibilities to CACI.

91.     Ngo's Employment Agreement was supported by fair and adequate consideration and constitutes binding and enforceable obligations.

92.     The Employment Agreement is necessary to protect CACI's legitimate business interests, does not impose an undue hardship on Ngo, and is not against the public interest.

93.     All conditions precedent necessary to permit CACI to enforce the Employment Agreement have been performed or have occurred.

94.     By virtue of Ngo's conduct, including the misappropriation of confidential, proprietary, and trade secret information, she has breached, and continues to breach, her Employment Agreement.

95.     As a direct and proximate result of Ngo's conduct, Ngo has caused, and will continue to cause irreparable harm to CACI and its legitimate business interests. The harm caused by Ngo is continuing and cannot be compensated by monetary damages alone, subjects CACI to immediate and irreparable harm, and thus, CACI is entitled to injunctive relief, including a temporary restraining order and preliminary injunction, enjoining Ngo from misappropriating CACI's confidential, proprietary, and trade secret information and requiring Ngo to return the misappropriated materials.

### Count IV – Breach of Fiduciary Duty

96.     CACI realleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

97.     As a CACI employee, Ngo owed CACI a duty to act in its interests and to place the interests of CACI and its shareholders above her own in cases where those interests conflict.

98.    Ngo acknowledged that she owed these duties to CACI in her Employment Agreement.  The relevant provision provides:

> **Fiduciary Duties.** I understand that as an employee the law places upon me certain fiduciary responsibilities to CACI including, the duty to place he interests of CACI and its shareholders above my own personal interest in any case where they might conflict. I will fully perform my fiduciary responsibilities to CACI as required by law both during and after the period of my employment.

99.    CACI also instructs employees of their fiduciary duties to use trade secrets or confidential or proprietary information in authorized manners only.  The Standards of Ethics and Business Conduct Manual that CACI disseminates and requires its employees to read, understand, and certify the same, lists the proper use of this information as a part of a CACI employee's fiduciary duty to CACI.  *See* Mengucci Decl, Ex. B.

100.    Ngo certified that she read and understood these duties. *See* Mengucci Decl, Ex. C.

101.    By virtue of Ngo's conduct, including the misappropriation of confidential, proprietary, and trade secret information, she has breached, and continues to breach, her duties to CACI.

102.    As a direct and proximate result of Ngo's conduct, Ngo has caused, and will continue to cause, irreparable harm to CACI and its legitimate business interests. The harm caused by Ngo is continuing and cannot be compensated by monetary damages alone, subjects CACI to immediate and irreparable harm, and thus, CACI is entitled to injunctive relief, including a temporary restraining order and preliminary injunction, enjoining Ngo from misappropriating CACI's confidential, proprietary, and trade secret information and requiring Ngo to return the misappropriated materials.

## REQUEST FOR INJUNCTIVE RELIEF

103.    CACI realleges and incorporates herein by reference all preceding paragraphs as if fully alleged herein.

104.    Unless Ngo is enjoined from engaging in additional misconduct, CACI will be irreparably harmed in the marketplace by having its confidential, proprietary, trade secret information improperly, unlawfully, and competitively used against it and by loss of customer goodwill.

105.    CACI has no adequate remedy at law for all of Ngo's misconduct, as money damages are not adequate to compensate for the ongoing harm caused by Ngo's misconduct.

106.    CACI has a clear legal right to the requested relief, and the balance of equities weighs heavily in CACI favor.

107.    The public interest favors entry of an injunction to protect the legitimate business interests of parties who have substantial relationships with customers.

## **PRAYER FOR RELIEF**

WHEREFORE, CACI seeks the following relief:

108.    An Order:

A.    Prohibiting Ngo from accessing, using, copying, disclosing, altering, destroying or deleting any trade secrets, proprietary and/or confidential information belonging to CACI, including any information (whether in electronic form or hard copy) taken without authorization from CACI's premises and computer systems, until further order of this Court;

B.    Requiring Ngo, within 24 hours of the entry of this Order, to deliver to a third-party expert retained by CACI for forensic imaging all computers (including any lap top or desk top computers maintained at Ngo's residence), external media or storage devices (including any flash drives or external hard drives) and cell phones in her possession,

custody or control .   The third-party forensics expert shall provide a written report of the contents to CACI's counsel and to Ngo;

C.      Requiring Ngo, to the extent that she maintains any accounts with third-party email providers (such as Google Gmail or Yahoo Mail) and with third-party data storage companies (such as iCloud, Dropbox, Google Drive, or OneDrive), to provide all necessary login information and passwords to CACI's forensic expert, within 24 hours of the entry of this Order, and that expert shall provide a written report of the contents of those accounts to CACI's counsel and to Ngo;

D.      Permitting the forensic expert to maintain custody of Ngo's computers, external media and storage devices, and cell phones until further Order of this Court;

E.      Enjoining Ngo from breaching or in any way violating the non-competition provisions of her Employment Agreement with CACI, and is specifically enjoining her from: (a) directly or indirectly providing goods or services to any CACI clients when such goods or services are in competition with those provided under contract or task order, or offered pursuant to an formal or informal proposal, to such clients by any CACI department for which Ngo worked within one (1) year prior to the end of her CACI employment; and (b) participating in competition for the award of any contract or task that any CACI department in which Ngo worked within one (1) year prior to the end of her CACI employment had identified as an opportunity prior to the end of her CACI employment;

F.      Requiring Ngo, within 48 hour of the entry of this Order, to file with this Court and serve upon CACI's counsel a sworn statement, under penalty of perjury, identifying: (a) all persons to whom Ngo has disclosed CACI's trade secrets and other proprietary and/or

confidential information; (b) all companies and individuals whom Ngo, directly or indirectly, communicated with in 2017 regarding potential employment; (c) all CACI competitors whom Ngo, directly or indirectly, communicated with after the end of her employment with CACI; and (d) all CACI customers whom Ngo, directly or indirectly, communicated with after the end of her employment with CACI;

G.      Requiring Ngo to deliver CACI's documents and other information, including all Trade Secret Information, in Ngo's possession, custody, or control to the undersigned counsel within twenty-four (24) hours, together with a signed representation under oath that Ngo has returned all such documents and other information and no longer has any such documents or other information in her possession, custody, or control; and

H.      Requiring Ngo to pay CACI its costs and attorneys' fees for bringing this lawsuit;

109.    Such other and further relief as this Court may find just and proper under the law.

Dated: September 5, 2017                     Respectfully submitted,

                                             **CACI, INC. – FEDERAL**


                                                 /s/
                                             _____
                                             Linda Jackson (VSB No. 37706)
                                             Dana Finberg (VSB No. 34977)
                                             Arent Fox LLP
                                             1717 K Street, NW
                                             Washington, DC  20006-5344
                                             Ph: 202.857.6000
                                             Fax:  202.857.6395
                                             linda.jackson@arentfox.com
                                             dana.finberg@arentfox.com

                                             *Attorneys for Plaintiff*

The undersigned authorized representative of CACI, INC. -- FEDERAL does hereby declare under penalty of perjury that he has read the foregoing Verified Complaint, and that the statements set forth therein are true and correct based on his personal knowledge, through information supplied to him by Plaintiff's employees and agents and through records kept by Plaintiff in the ordinary course of business.

This 5th day of September 2017.

John Mengucci

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing Verified Complaint was sent to a process server this 5th day of September 2017 for same day hand delivery upon the Defendant at the address listed below.  The undersigned also certifies that a copy of the Verified Complaint was sent to Defendant by email to the email addresses listed below on this 5th day of September 2017.

> Bao-Tran "CJ" X. Ngo
> 42516 Legacy Park Dr,
> Ashburn, Va. 20148
> btxngo@yahoo.com
> cj.x.ngo@gmail.com

Dated: September 5, 2017                    Respectfully submitted,

**CACI, INC. – FEDERAL**

_____/s/_____
Linda Jackson (VSB No. 37706)
Dana Finberg (VSB No. 34977)
Arent Fox LLP
1717 K Street, NW
Washington, DC  20006-5344
Ph: 202.857.6000
Fax:  202.857.6395
linda.jackson@arentfox.com
dana.finberg@arentfox.com

*Attorneys for Plaintiff*